## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 10-24338-CIV-COOKE/Torres

**ANDREW D. MARSHALL,**

        **Plaintiff,**

**vs.**

**UNITED STATES OF AMERICA,**

        **Defendant.**

_____/

### DEFENDANT'S *DAUBERT*[1] MOTION TO EXCLUDE PLAINTIFF'S OFFERED TESTIMONY OF EXPERT WITNESS, DR. ROBERTO A. MOYA, M.D.

COMES NOW the United States of America, through counsel, and pursuant to Rule 104, and Rule 702, Federal Rules of Evidence, to respectfully move for an order precluding the Plaintiff from offering testimony by Expert Witness (Dr. Roberto A. Moya, M.D.), based upon the following:

### Statement of the Case

On December 7, 2010, the Plaintiff filed his Complaint against the Defendant alleging that he was injured by corrections officers during an encounter within the Federal Detention Center in Miami, Florida ("FDC-Miami").  This personal injury action was brought against the United States of America under the Federal Tort Claims Act, ("FTCA") Title 28, United States Code, Section 1346(b), 2671, *et seq*.  In essence, Plaintiff alleged that, on February 23, 2008, the Defendant (through the actions of employees of the Federal Bureau of Prisons) was negligent when Plaintiff was required to be carried on a gurney while handcuffed, when being moved from his cell housing area to the Special Housing Unit ("SHU") and/or medical unit inside the institution (FDC-Miami).  Plaintiff alleged that his escorting corrections officers dropped him approximately 6 to 8 inches to the floor whereby the jolt caused the handcuff to impact his spine aggravating a pre-existing injury.     See DE #1, Complaint.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Crt. 2786, 125 L.Ed.2d 469 (1993).

In accordance with routine discovery, Plaintiff disclosed the expert testimony of Dr. Roberto A. Moya, M.D., Board Certified Orthopedic Surgeon, with one Expert Report, dated January 2, 2014.   In his Report, Dr. Moya notes that he saw Marshall "for evaluation and treatment in regards to lower back pain radiating to both lower extremities as a result of injury sustained from an accident that occurred on 02/22/2008 as an inmate in the prison."[2] In his Report, Dr. Moya does not compare and/or contrast the MRI studies of Marshall taken on August 27, 2002 (following his utility cart accident) and on May 22, 2008 (following his alleged incident at FDC-Miami).   Nor (in his Report) does Dr. Moya identify anything which would confirm that Marshall was injured as the result of anything that happened on February 23, 2008.   Indeed, aside from several references to an oral history provided by the patient, Marshall, Dr. Moya's Report does not refer to the alleged events of February 23, 2008.

---

[2]The following is a brief statement of facts which are supported by deposition testimony and pertinent medical records (as reflected in the Defendant's Motion for Summary Judgment; DE #168):

On September 10, 1962, Andrew David Marshall was born in New York. Marshall moved to South Florida in 1992 where he worked in carpentry after Hurricane Andrew.  After a few months, Marshall worked in maintenance for the hotel industry (Marshall worked as a maintenance engineer for Marriott at Boca Raton for about three years.).

Following the events of September 11, 2001, Marshall found work as a temporary Marina Worker at a marina operated by the City of Miami.   During his third day of employment with this marina, Marshall says he was injured when a co-worker unexpectedly started an electric utility vehicle while Marshall was passing in front of it causing a wheel to roll over his foot.   According to Marshall, this resulted in his "foot being caught, dragged under the vehicle, it twisted me and levered me, slamming me into the ground, onto the curb, onto the sidewalk."   No bones were broken.

Following the early morning utility vehicle incident, Marshall reported the incident, declined medical care, and decided to continue to work for a few hours.   No report was generated. However, his foot became swollen and he left work early.   Several days after the utility vehicle incident, Marshall says he was "evaluated" by Sunshine Medical Services. No objective findings were identified. Marshall was given anti-inflammatory medication and physical therapy. Still, Marshall continued to work for six to eight months.   About seven months after the utility vehicle incident, upon the recommendation of Dr. Ira Posner, MD (an orthopedic physician who had recommended physical therapy), Marshall had an MRI (magnetic resonance imaging) performed.   According to Marshall, Dr. Posner told him he had degenerative disc disease.

In July 2007, Marshall was arrested for federal firearms violations and was subsequently detained at the Federal Detention Center ("FDC"), Miami, Florida, pending trial. Upon arrival at FDC, Marshall was medically evaluated. Though Marshall reported his prior medical history (stemming from the 2002 incident), no permanent disability was identified. Marshall was assessed as a Care Level One (least of four BOP Care Level Classifications).

Moreover, in his subsequent deposition, Dr. Moya acknowledges that his Report does not include any opinion regarding causation.[3]   Nor does Dr. Moya's Report offer any explanation for the changes reflected in the subsequent MRI study of Marshall taken on June 12, 2009 or the significance thereof.

As discussed below, Dr. Moya's Expert Report 1) is not supported by scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; 2) is not supported by sufficient facts or data; 3) is not the product of reliable principles and methods; and 4) is not the product of reliable application of any such principles and methods to the facts of the case.   Rule 702, Federal Rules of Evidence.   In addition, Dr. Moya's Expert Report 1) is not based upon methodology that can and has been tested; 2) is not based upon methodology that has been subjected to peer review and publication; 3) is not based upon any known or potential rate of error and any existing and maintained standards controlling the operation of such methodology; and 4) is not based upon any methodology that has gained general acceptance in the scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Crt. 2786, 125 L.Ed.2d 469 (1993), Indeed, because his Expert Report, and any testimony based thereon, is nothing more than the *ipse dixit* of Dr. Moya, it should be excluded from these proceedings.

---

[3]In pertinent part, the transcript of Dr. Moya's deposition, pages 95-96, reads as follows:

| | |
|---|---|
| Defendant: | What is the significance of the observations that you shared with us as reflected in the paragraph dealing with lumbar spine on Defendant's Exhibit Number 1 [Dr. Moya's Report]? |
| Dr. Moya: | The observation was that there was normal motor function of the lower extremities without any deficit and that there was facet – irritation of the facet joints and spasm, objectively, of the lumbar spine with restriction of motion.   This represents a spine condition that is a moderate degree of severity. |
| Defendant: | Were you able to form an opinion with regard to causation in relation to these conditions? |
| Dr. Moya: | Yes. |
| Defendant: | And what was your opinion with regard to causation.   I don't see it included in this portion of your report. |
| Dr. Moya: | It wasn't included because I wasn't asked causation at the time. |

## Plaintiff's Offered Expert Witness Testimony

### Dr. Moya's Expert Report[4]

As noted above, in routine discovery, on January 21, 2014, Plaintiff disclosed the Expert Report of Dr. Roberto A. Moya Fiallo, M.D., a "board certified orthopedic surgeon with Calhoun Orthopedics and Neurosurgery." In his Report, Dr. Moya offers the following

**IMPRESSION:**

1.      Cervical, thoracic, and lumbosacral spine strain and sprain.
2.      L3-L4, L4-L5, and L5-S1 spinal stenosis with facet hypertrophy.
3.      Left lateral disc herniation with annular tear at L4-L5.
4.      L1-L2 left neuroforaminal disc protrusion with annular tear.
5.      L2-L3 annular tear resulting in moderate left foraminal stenosis.
6.      In general, spinal stenosis from L2 to S1 and multilevel spinal and segmental stenosis with lower extremity radiculopathy left worse than right.
7.      Gait abnormality secondary to above requiring the use of wheelchair.
8.      Polyneuropathy probably secondary to a combination of compression and nutritional.

Thereafter, Dr. Moya's Report presents a prognosis and plan for treatment (again, with no mention of the cause for his condition).   Indeed, Dr. Moya's Report does not offer any opinion regarding causation.   Nor does Dr. Moya's Report raise any issue with regard to the medical care Marshall has received while in the custody of the BOP.   Dr. Moya's Expert Report does not cite any authority or references.   Nor does it identify any principles or methodology used in forming his opinions and conclusion.

---

[4]In pertinent part, Rule 26(a)(2), Federal Rules of Civil Procedure, provides as follows:

**(2)      Disclosure of Expert Testimony.**

(A)      *In General*.   In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under federal Rules of Civil Evidence 702, 703, or 705.

(B)      *Witnesses Who Must Provide a Written Report*.   Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report-prepared and signed by the witness-if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involved giving expert testimony.   The report must contain:

(i)      a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)      the facts or data considered by the witness in forming them;

(iii)      any exhibits that will be used to summarize or support them;

## Dr. Moya's Deposition Testimony

On April 7, 2014, and again on July 8, 2014, Dr. Moya was deposed regarding his qualifications, his experience, the material (facts and data) he considered in drafting his Expert Report, and his opinions as expressed therein.

### Material (Facts and Data) Considered in drafting Dr. Moya's Expert Report

At his deposition, Dr. Moya acknowledged that, in preparation for his evaluation and assessment of Marshall, on January 2, 2014, he spoke with Marshall about his history, reviewed "a stack of medical records"[5] (admitting that he "did not go page by page, no. I scanned through it and reviewed the parts or the information that I thought was pertinent.") and reviewed four MRI studies.[6] During his examination of Marshall in January 2014, Dr. Moya observed "the clinical findings of spasm and the findings under lumbar spine, in addition to the review of the MRIs and the progression as it relates to the MRI from 2008 to the present.  Those are the objective findings."[7]  Dr. Moya also admitted that, prior to drafting his Report and/or appearing for deposition, he had not reviewed any deposition transcripts (including those of Marshall or any of

---

[5]In his Report, Dr. Moya adds:

I should mention the fact that I have reviewed a stack of medical records that compiled, measured approximately 1 foot in thickness in order to prepare this report and to generate this report with proper information.

[6]See Dr. Moya's deposition, page 22.

[7]See Dr. Moya's deposition, page 97.    In pertinent part, page 98, Dr. Moya further testified as follows:

| | |
|---|---|
| Defendant: | Let's be specific and talk about the observations that you made in 2014 at your examination; okay?  What objective findings do you attribute to the incident of February 2008? |
| | .    .    .    . |
| | As it relates to the exam only. |
| Dr. Moya: | You mean if I was a robot and was told to examine someone just to say what is found?  I can tell you that. |
| | If you're asking me how it relates, the examination with the whole gestaltic exam, I would say that the spasm, the increased pain of motion, the restriction of motion, the straight leg raising and – basically those. |
| Defendant: | These are the things that you observed in 2014; is that correct? |
| Dr. Moya: | Correct. |

his caregivers).[8]  Dr. Moya did acknowledge that reviewing such transcripts "can be helpful sometimes."[9]   At his deposition, Dr. Moya acknowledged that he did not do anything else in order to create his Expert Report and that it contains all of his opinions.[10]   Dr. Moya does not cite any authority or references.   Nor does he identify any principles or methodology used in forming his opinions and conclusion.

In his deposition, pages 153-55, Dr. Moya also acknowledged that the MRIs taken of Marshall on May 22, 2008 and August 2002 did not reveal evidence of trauma:

| | |
|---|---|
| Defendant: | With regard to the MRI report, May 22, 2008, what can you point to on this report that identifies evidence of a traumatic event? |
| | .    .    .    . |
| Dr. Moya: | The only thing that would point to it is the fact that an MRI was done.   It's usually done because of some type of pain.   If there is a history of trauma, then that's the only reason.   There is nothing here that depicts trauma, per se. |
| Defendant: | Is there any evidence reflected in the MRI report from August 2002, Defendant's Exhibit 3, that evidences trauma? |
| Dr. Moya: | As such, by itself, no. |
| | .    .    .    . |
| Defendant: | The impressions that are noted, then, if you can't attribute them to trauma, what can you attribute them to?   And that would go for both 2002 and 2008? |
| Dr. Moya: | In general, you can have a herniated disc from a documented specific trauma or it can be from microtrauma that is not documented and it can cause herniation.<br><br>        You can get a herniation from a trauma that is not, per se, documented trauma; for example, sneezing, pressure, increasing pressure inside the disc, but it's not considered traumatic. |

---

[8]In pertinent part, pages 19-25, Dr. Moya further testified as follows:

| | |
|---|---|
| Defendant: | All right.   In addition to speaking to Mr. Marshall, as you've described, reviewing the four MRI reports as you've described, conducting a physical examination as you have briefly described and reviewing the medical records which are contained in Defendant's Exhibit Number 2, what else did you review to craft the report that contains all of your opinions and statements as reflected in Defendant's Exhibit Number 1? |
| Dr. Moya: | Well, once that was done, I dictated the report in a tape recorder |
| Defendant: | And you haven't made any changes to it since then? |
| Dr. Moya: | No. |
| Defendant: | Are you aware that Mr. Marshall gave a deposition with regard to the events in this case. |
| Dr. Moya: | No. |
| Defendant: | Do you know whether or not any of the caregivers who interacted with Mr. Marshall as reflected in Defendant's exhibit Number 2 gave depositions? |
| Dr. Moya: | No. |
| Defendant: | Are you aware of whether or not any of the caregivers who interacted and/or examined Mr. Marshall as reflected in to records which are Defendant's Exhibit Number 2 testified in court with regard to Mr. Marshall and his condition? |
| Dr. Moya: | No. |

[9]See Dr. Moya's deposition, page 26.
[10]See Dr. Moya's deposition, page 24.

In his deposition, pages 158-60, Dr. Moya was also asked about the changes subsequently reflected in the 2009 MRI:

Defendant:    [A]s I understand you to say it, the 2009 MRI reflects changes which, in relation to the 2008 MRI, might be attributable to trauma; is that correct?

Dr. Moya:     Within reasonable medical probability, yes.

Defendant:    When might the trauma have taken place, which is manifested in the report of 2009?

Dr. Moya:     Well, the trauma that I know that is documented is the one in 2/22/2008.

Defendant:    But the change, as I hear you say it, is reflected in the MRI from 2009, and it is not reflected in the 2008 MRI.

Dr. Moya:     Correct.

Defendant:    Are you saying the trauma might have occurred prior to the May 2008 MRI, but not manifested until 2009?

Dr. Moya:     Correct.

Defendant:    Can you explain that process?

Dr. Moya:     Well, it's a process that – a fracture occurs right away.  An injury to a facet sensitive disc occurs and then gradually becomes worse with time.
              I think we discussed this at the last deposition as well.  So it takes months, and sometimes years, for the progression of a condition to occur.

Defendant:    Okay.  So you are attributing the changes that you see in 2009, as reflected in Defendant's Exhibit 4, to a trauma which allegedly occurred in February 2008, even though those changes aren't reflected in the MRI taken in May of 2008.  Do I understand you correctly?

Dr. Moya:     Correct.  Yes.

Defendant:    Aside from trauma, you do acknowledge that another explanation, a reasonable explanation for these changes is the natural progression of degenerative disc disease; is that correct?

Dr. Moya:     That's possible.  Correct.

Defendant:    And there is no way to tell the difference between the two; is that correct?

                                    .    .    .    .

Dr. Moya:     By looking at the MRI alone, no.

In his deposition, pages 53-54 and 160-61, Dr. Moya was also asked about the neurodiagnostic study of Marshall on July 22, 2011.

Defendant:    Can you decipher what the meaning or significance of that neurology report is, based on what you've written in your report?

Dr. Moya:     What it says is that there is a – I can decipher it, as far as knowing that there is no specific compression of a nerve root that will show one specific nerve that is compressed, but rather a generalized compression and that there is a polyneuropathy which is related to nerves being irritated by a toxic lack of vitamins, as well as some compression component, but in general, so that's the way I decipher it.

                                    .    .    .    .

Defendant:    And polyneuropathy, again, is what?

Dr. Moya:     It can be toxic. It can be nutritional. It can be related to a neurological disease.

| | |
|---|---|
| Defendant: | And what impact on the body does polyneuropathy have -- can it be expected to have? |
| Dr. Moya: | By "impact," I imagine you are asking me symptoms. |
| Defendant: | Yes. |
| Dr. Moya: | -- or consequences. |
| Defendant: | That's correct. |
| Dr. Moya: | In general, to the limbs, it can cause numbness, tingling sensation, sometimes weakness, cramping, that sort of symptomatology. |
| Defendant: | Are those symptoms that Mr. Marshall complained of to you? |
| Dr. Moya: | Yes. |
| Defendant: | Are those symptoms that Mr. Marshall complained of to other caregivers during the course of his time inside the Bureau of Prisons? |
| Dr. Moya: | I believe so, yes. |
| Defendant: | Is there any way to distinguish between those things that Mr. Marshall was complaining of, between degenerative disc disease, an incident of trauma from February 2008 and polyneuropathy? |

.    .    .    .

| | |
|---|---|
| Dr. Moya: | Based on the neurodiagnostic study, no.[11] |

In his deposition, pages 168-69, Dr. Moya also acknowledged that, on July 11, 2012, Marshall underwent an EMG, with a follow up on October 10, 2012, as reported by Dr. Holford.[12]

---

[11]Earlier in his deposition (pages 55-56), Dr. Moya offered similar testimony:

| | |
|---|---|
| Defendant: | You indicate that there is some significance. What significance is there? |
| Dr. Moya: | Well, the significance is that we know that he has some polyneuropathy type of condition. |
| Defendant: | What does that mean? |
| Dr. Moya: | I just explained it before, toxic vitamin deficiency or some kind of toxic condition related to the nerve roots, itself. |
| Defendant: | Are you able to form an opinion with regard to causation with regard to the polyneuropathy that you've just described? |
| Dr. Moya: | No, I'm not. |

.    .    .    .

| | |
|---|---|
| Defendant: | Are you able to share an opinion with regard to how that polyneuropathy that you've described as reflected in your report is manifested or was manifested in Mr. Marshall back on July 22nd, 2011? |
| Dr. Moya: | I'm not considering the neurodiagnostics as a form of letting me know where the causation is. |
| Defendant: | So this was included in your report for what reason? |
| Dr. Moya: | Because it's part of the records of the studies that were done to the patient. I think what it tells you is that there is something else going on other than just the problem related to the spine, itself. |
| Defendant: | But you don't know the cause, based upon what you've just described? |
| Dr. Moya: | No, I don't. |

[12]http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies:

An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction. Nerve conduction studies measure how well and how fast the nerves can send electrical signals.

Defendant:     What is the general impression that Dr. Holford identifies in relation to Mr. Marshall?

Dr. Moya:      Electric diagnostic studies mainly showed a sensory motor polyneuropathy.

Defendant:     Does he also indicate that there is no radiculopathy?

Dr. Moya:      Correct, on the EMGs.

Defendant:     To what extent does he express an opinion with regard to the spinal disease that's causing any significant leg weakness?

Dr. Moya:      According to this note of October 10, 2012, he states, and I quote: I do not feel that this spinal disease is causing significant leg weakness. It is more of a polyneuropathy, so I do not think a decompression would benefit him, period, end quote.

Defendant:     Does Dr. Holford, in his report or in his follow up, identify any indication of trauma as being the cause of his disc disease or polyneuropathy?

                          .     .     .     .

Dr. Moya:      At the beginning of the report, chief complaint, it says: Low back, auto accident 2002. That's the only indication of it. And it states that he was hit by an automobile injuring his back, at the beginning of the sentence, under history.

        In his deposition, pages 56-61, and 110-12, Dr. Moya also acknowledged that, on January 26, 2012, Marshall had a 4th MRI which reflected significant changes since his last MRI.

Defendant:     Okay. With regard to the paragraph that you just read in relation to the MRI report of January 26, 2012, are you able to offer an opinion with regard to the causation for the conditions reflected therein?

Dr. Moya:      Yes.

Defendant:     And what is the causation?

Dr. Moya:      I think it's a progression of the previous degenerative changes that we're seeing in the other MRIs of 2008 and 2009.

Defendant:     Does that also include the MRI report from 2002?

                          .     .     .     .

Dr. Moya:      It does include the progression from 2002, yes.

Defendant:     And you characterized it your phrase just now was "degenerative condition –"

Dr. Moya:      Correct.

---

Nerves control the muscles in the body with electrical signals called impulses. These impulses make the muscles react in specific ways. Nerve and muscle problems cause the muscles to react in abnormal ways.

If you have leg pain or numbness, you may have these tests to find out how much your nerves are being affected. These tests check how well your spinal nerves and the nerves in your arms and legs are working.

An EMG is done to:

- Find diseases that damage muscle tissue, nerves, or the junctions between nerve and muscle. These problems may include a herniated disc, amyotrophic lateral sclerosis (ALS), or myasthenia gravis (MG).
- Find the cause of weakness, paralysis, or muscle twitching. Problems in a muscle, the nerves supplying a muscle, the spinal cord, or the area of the brain that controls a muscle can cause these symptoms. The EMG does not show brain or spinal cord diseases.

| | |
|---|---|
| Defendant: | -- is that correct? |
| Dr. Moya: | Yes. |
| Defendant: | "Degenerative" is what form of a condition? |
| Dr. Moya: | "Degenerative" is an arthritic condition or wear and tear.  And "aggravation" means that it has gotten worse. |

.   .   .   .

| | |
|---|---|
| Defendant: | Is it fair to say that the progression that you see reflected or saw reflected in the MRI from August 27th, 2002 and the MRI report and film study that you say you saw in May of 2008 is reflective of degenerative disc disease? |
| Dr. Moya: | Post-traumatic degenerative disc disease, yes. |
| Defendant: | When you say "post-traumatic," what trauma? |
| Dr. Moya: | He originally had a trauma of 2002, which -- it was documented that it was related to the accident of 2002. |
| Defendant: | And as we discussed earlier, there is no way to objectively identify the trauma that Mr. Marshall reported having taken place in 2002 as being the cause of the degenerative disc disease reflected in his August 27th, 2002 MRI; isn't that correct? |

.   .   .   .

| | |
|---|---|
| Dr. Moya: | Yes. Correct. |
| Defendant: | Only by the documentation and the complaint of the pain can we go by that. |
| Defendant: | And with regard to the changes which may or may not be reflected in the May 2008 MRI changes from the 2002 MRI -- again, there is no way to tell whether there was anything other than a routine progression of degenerative disc disease as reflected in those two reports; is that correct? |

.   .   .   .

| | |
|---|---|
| Dr. Moya: | If there had been no trauma, there wouldn't be -- there may or may not be any difference. However, there was a documented trauma and therefore I -- you know, your statement is not correct. |
| Defendant: | And, again, that trauma being? |
| Dr. Moya: | The trauma being the date of 2008. |
| Defendant: | February 23rd, 2008? |
| Dr. Moya: | Correct. |

Finally, in his deposition, pages 70-72, Dr. was asked about the impact of Marshall's use of a wheelchair.

| | |
|---|---|
| Defendant: | Is there any significance to a patient like Mr. Marshall using a wheelchair 90 percent of the time in relation to his orthopedic health? |

.   .   .   .

| | |
|---|---|
| Dr. Moya: | There can be. |

.   .   .   .

| | |
|---|---|
| Defendant: | How? |
| Dr. Moya: | Well, it makes him weaker to the lower extremities and dependent on the wheelchair. |
| Defendant: | How? |

.   .   .   .

| | |
|---|---|
| Dr. Moya: | Because of using it constantly, he becomes used to using it, so it gives him more weakness and more dependence on the wheelchair. |
| Defendant: | What if any impact would such use have upon his orthopedic health? |

.   .   .   .

| Dr. Moya: | It is kind of broad and vague, the question.   But in general, it weakens his lower extremities it makes him more dependent on the wheelchair. |
|---|---|
| Defendant: | Would it be significant with regard to the condition of his spine? |
| Dr. Moya: | It can. |
| Defendant: | How? |
| Dr. Moya: | -- affect his spine because of sitting constantly. |
| Defendant: | And how would you expect it to affect his spine? |
| Dr. Moya: | I think it would make it weaker and would make him more dependent of using the wheelchair. |
| Defendant: | Would you expect it to contribute to the degenerative nature of his disc disease? |

.   .   .   .

| Dr. Moya: | It can. |
|---|---|
| Defendant: | How? |
| Dr. Moya: | The same reason, because of being sitting most of the time. |

## **The Applicable Law**

### Federal Law

Rule 401, Federal Rules of Evidence, governing the test for relevant evidence, provides that evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. However, relevant evidence may be excluded if its probative value "is substantially outweighed by the danger of unfair prejudice."  Rule 403, Federal Rules of Evidence.

Rule 702, Federal Rules of Evidence, (Testimony by Expert Witness) provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

FED.R.EVID. 702.  Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  This "gatekeeping" function must be performed with regard to the admissibility of both expert scientific evidence and expert technical evidence.  *See United Sates v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)(citing *Daubert*, 509 U.S. at 589 n. 7, 597; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).  "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *Id*.  (alterations and internal quotation mark omitted).

> In determining the admissibility of expert testimony, the Eleventh Circuit requires district courts to conduct a three-part inquiry about whether:
>
> > (1)   the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the applications of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.
>
> *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010)(citing *Frazier*, 387 F.3d at 1260 . ***The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the testimony satisfies each prong.*** *See id.* (citing *Boca Raton Cmty. Hosp. v. Tenet Health Care*, 582 F.3d 1227, 1232 (11th Cir. 2009)).

*Skye v. Maersk Line Limited Corporation*, 2012 WL 1252523 (S.D. Fla.), pages 1-2. (Emphasis added)[8]

<u>Discussion</u>

Plaintiff has disclosed only one expert (Dr. Roberto A. Moya Fiallo, M.D./Orthopedic Surgeon) who has been deposed about his Report/opinions and knowledge of the case.   As noted above, Dr. Moya's Report presents a survey of Plaintiff's BOP medical care, a prognosis and a plan for treatment, but makes no mention of any cause for his condition.   Nor does Dr. Moya's Report raise any issue with regard to the medical care Marshall has received while in the custody of the BOP.

---

[8]In *Daubert*, the Supreme Court suggested a non-exhaustive list of several factors to consider in determining if a specific methodology is reliable under Rule 702: whether the methodology can and has been tested; whether the methodology has been subjected to peer review and publication; the known or potential rate of error and the existence and maintenance of standards controlling operation of the methodology; and whether the methodology has gained general acceptance in the scientific community. *Daubert*, 509 U.S. at 593-94 (declining to set forth a "definitive checklist or test"); *accord Kumho*, 526 U.S. at 141.   In *Kumho*, 526 U.S. the Supreme Court emphasized, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."   *Kumho*, 526 U.S. at 152.   Nevertheless, while the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95. "But conclusions and methodology are not entirely distinct from one another . . . [and] nothing in *Daubert* or the Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."   *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).   "Rather, the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix*, 609 F.3d at 1194 (quoting *Joiner*, 522 U.S. at 146).   See *Skye*, *supra*, page 2.

First, regarding any issue (including, but not limited to, causation), Dr. Moya's Expert Report 1) is not supported by scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue; 2) is not supported by sufficient facts or data; 3) is not the product of any identified reliable principles and methods; and 4) is not the product of the application of any such reliable principles and methods to the facts of the case.   Rule 702, Federal Rules of Evidence.   In addition, Dr. Moya's Expert Report 1) is not based upon methodology that can and has been tested; 2) is not based upon methodology that has been subjected to peer review and publication; 3) is not based upon any known or potential rate of error and any existing and maintained standards controlling the operation of such methodology; 4) and is not based upon any methodology that has gained general acceptance in the scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Indeed, because his Expert Report, and any testimony based thereon, is nothing more than the *ipse dixit* of Dr. Moya, it should be excluded from these proceedings.

Essentially, Dr. Moya's Expert Report provides a cursory survey of the health care provided to Marshall based upon a review of some of the medical records related to his treatment. It acknowledges that "an MRI of the lumbar spine was accomplished at Larkin Hospital on 05/022/2008.   The report of Dr. Patricia Rossie showed an L3-L4 disc bulge with mild bilateral neuroforaminal stenosis which also included mild thickening of the ligamentum flavum and facet hypertrophy.   There was also an L4-L5 broad-based disc bulge with moderate bilateral neuroforaminal stenosis and encroachment of the exiting nerve root."   Thereafter, the Expert Report details that, "According to the patient, the symptoms that were newly appeared as related to the accident of 02/23/2008 include a significant intractable pain in the lumbar area."   The Report also notes that "Eventually, on 09/19/2008, a judge ordered the Bureau of Prison to provide the patient with a wheelchair and he has been using this wheelchair ever since."[13]   Indeed, Marshall has never medically been required to use a wheelchair.   At a hearing held in Marshall's criminal case on March 24, 2008 (a month after the incident at issue in these Civil proceedings) concerning

---

[13]At his deposition, Dr. Moya acknowledged that "wheelchairs are not that good for backs . . . ." See Dr. Moya's deposition, page 181.

the medical examination of the defendant with respect to pain management and wheelchair (See DE #46, DE 46-3, page 2), Dr. Edwin Lopez, M.D., then staff physician at FDC-Miami, was examined by the Court, the Government, and by Marshall.

| | |
|---|---|
| Government: | Dr. Lopez, how many times in all has Mr. Marshall been seen by a doctor or physician's assistant at FDC? |
| Dr. Lopez: | Give me a chance to count.   Hold on please. |
| | (Pause) |
| Government: | Yes. |
| Dr. Lopez: | Okay. One, two, three, four, five, six documents in encounter, and three times that he was scheduled to be seen and he was a no-show. |
| Government: | Dr. Lopez, other than the nerve conduction test which you described a moment ago, are there any other diagnostic tests that you believe should be done on Mr. Marshall to diagnose the symptoms that he is having? |
| Dr. Lopez: | The orthopedist also recommended to repeat the MRI of his lower back, because it is our understanding that the results of the tests of the MRI is already six years old. So, possibly he has self-improvement from that time, and we have to update how his condition is doing from then till now. |
| Government: | And Dr. Lopez, let me take that in two steps.   First, I take it that FDC has not performed an MRI of Mr. [Marshall], is that correct? |
| Dr. Lopez: | That is correct. |
| Government: | But you seem to have an MRI record.   Where did that come from? |
| Dr. Lopez: | We have a copy—sorry.   Hold on please. |
| | We have a copy from one done on 8-27-2002 at Health South Diagnostic Center of Weston. |
| Government: | Dr. Lopez- |
| Dr. Lopez: | And this was provided by the patient.   So I assume the patient had his own copy. |
| Government: | Dr. Lopez, other than the pain medications you described earlier[14], do you believe |

---

[14]Dr. Lopez testified that on the preceding Friday, Marshall had been examined by Dr. Ponce de Leon, an orthopedic surgeon brought to the FDC-Miami to see Marshall.

| | |
|---|---|
| Government: | Were you or Dr. Ponce de Leon able to reach a diagnosis on Friday? |
| Dr. Lopez: | Based on the exam, the physical findings, the orthopedic surgeon came to the conclusion that although the patient had a prior history of a low back problem, that there was no compromise to his lower extremities and that there was no reason why the gentleman could not walk of his own volition. |
| Government: | How about pain medications?   Have any pain medications been prescribed to Mr. Marshall? |
| Dr. Lopez: | Yes.   We have tried several pain medications.   The first one was Elavil or amitriptyline, and it's a medicine that is used in diabetics that also can have nerve pain and it's also used to control chronic pain, especially when it's suspected of neurological origin, but the patient refused. |
| | .   .   .   . |
| Government: | Have any other pain medications been prescribed to Mr. Marshall? |
| Dr. Lopez: | Two types for nonsteriodal pain: One is Motrin, which is the chemical name is ibuprofen; and the other one is Naproxen, or anaprox. |

| | |
|---|---|
| | there are any other pain medications that the defendant should be prescribed? |
| Dr. Lopez: | No, sir. |
| Government: | And to the Court's earlier question, do you believe that it's necessary for the defendant be transported short distances in a wheelchair—or, let me just ask you in a different way, Dr. Lopez, if you can describe how much and to what extent Mr. Marshall needs a wheelchair to get around. |
| Dr. Lopez: | From an examination point of view, there's no reason why he wouldn't be able to ambulate by himself.   But, of course, pain is subjective, and if the patient says he can't walk or has difficulty walking, there's no one specific test that can be done to tell me why he can or cannot walk.   But based on the examine, [sic] there's no neurological problem that he should not walk. |

See DE #46, DE 46-3, pages 15-17.

Returning to Dr. Moya's survey of Marshall's medical case as reflected in his Expert Report, Dr. Moya offers no criticism of the care provided to Marshall by BOP (or anyone else). In his Report, Dr. Moya does not compare and/or contrast the MRI studies of Marshall taken on August 27, 2002 (following his utility cart accident) and on May 22, 2008 (following his alleged incident at FDC-Miami).   Nor does Dr. Moya identify anything which would confirm that Marshall was injured as the result of anything that happened on February 23, 2008.   Indeed, in his deposition, Dr. Moya acknowledges that his Report does not include any opinion regarding causation.[15]   Nor does Dr. Moya's Report offer any explanation for the changes reflected in the

---

| | |
|---|---|
| Government: | And Dr. Lopez, in your opinion, are the three drugs that you've just mentioned the appropriate course of treatment for the pain the defendant has described? |
| Dr. Lopez: | Yes. |
| The Court: | Has he actually received those or were they just prescribed but not taken? |
| Dr. Lopez: | They were offered, but he signed a refusal form that he wouldn't take it. |
| The Court: | For all three? |
| Dr. Lopez: | Hold on. |
| | Yes.   The Motrin and the Naproxen were refused on the 22nd of February. |

See DE #46, DE 46-3, pages 12-14.

[15]In pertinent part, the transcript of Dr. Moya's deposition, pages 95-96, reads as follows:

| | |
|---|---|
| Defendant: | What is the significance of the observations that you shared with us as reflected in the paragraph dealing with lumbar spine on Defendant's Exhibit Number 1 [Dr. Moya's Report]? |
| Dr. Moya: | The observation was that there was normal motor function of the lower extremities without any deficit and that there was facet – irritation of the facet joints and spasm, objectively, of the lumbar spine with restriction of motion.   This represents a spine condition that is a moderate degree of severity. |

subsequent MRI study of Marshall taken on June 12, 2009 or the significance thereof.   Dr. Moya's Expert Report also fails to apply his survey of BOP provided medical care to any discernable standard of care.   As noted above, he simply offers his own prognosis and treatment plan. But Dr. Moya provides nothing to demonstrate how any action or inaction of anyone was the proximate cause of any medical condition of the Plaintiff, much less the exacerbation thereof.

At deposition, Dr. Moya points to nothing other Plaintiff's oral complaint of increased pain, and Dr. Moya's opinion, that Marshall's back condition was exacerbated because of an incident that allegedly occurred in February 2008.   Moreover, as noted above, he suggests that the exacerbation may be the result of the natural progression of his previously diagnosed degenerative disc disease.

In each of these examples, the support Dr. Moya offers for his opinions (not otherwise found in his Report and offered for the first time at deposition, that the orthopedic changes reflected in the Plaintiff's post May 22, 2008 medical care was the result of the alleged traumatic event of February 23, 2008) is not reliable scientific evidence of causation.   At best, they are simply descriptions of reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation.   Importantly, Dr. Moya does not purport to follow the methodology ordinarily followed by medical care providers, much less orthopedic practitioners.

Second, Dr. Moya's Expert Report is based upon an incomplete review of the readily available medical records and other facts and data regarding the health care provided to Marshall during his February 2008 detention at the FDC-Miami.[12]   This was explored in his deposition.

---

| Defendant: | Were you able to form an opinion with regard to causation in relation to these conditions? |
|---|---|
| Dr. Moya: | Yes. |
| Defendant: | And what was your opinion with regard to causation.   I don't see it included in this portion of your report. |
| Dr. Moya: | It wasn't included because I wasn't asked causation at the time. |

[12]In pertinent part, Florida Statute 766.102(5) provides that a "person may not give expert testimony concerning the prevailing professional standard of care unless the person is a health care provider who holds an active license *and conducts a complete review of the pertinent medical records* and meets [other] criteria, . . . .

First, Mr. Moya's Report makes no reference to the documented medical encounter between Marshall and BOP Physician's Assistant, Rosa Alminaque, on February 25, 2008.   Nor was Dr. Moya familiar with PA Alminaque's deposition testimony regarding the same encounter.[16]

---

[16]See Alminaque's deposition (attached), which, in pertinent part, (pages 162-64) provides as follows:

| | |
|---|---|
| Defendant: | Now you are checking the back as noted on page 2 of Plaintiff's Exhibit 1.   Is that in response to his concern that he has back pain and he's had it since Friday the 22nd of February 2008? |
| Alminaque: | That is correct. |
| Defendant: | Al right.   So what are you looking for, as you perform the inspection of his back? |
| Alminaque: | Okay.   I'm looking for any visible injuries of hematoma. |
| Defendant: | Hematoma? |
| Alminaque: | Hematoma is accumulation of blood below your skin. |
| Defendant: | We call that a bruise; is that right? |
| Alminaque: | That's a bruise. |
| | .   .   .   . |
| Defendant: | How long do bruises last? |
| Alminaque: | It could be a week or two weeks.   You check to see if you see any bruise, any hematoma. |
| Defendant: | So when you examined Mr. Marshall on the 25th of February, 2008, did you note any bruising? |
| Alminaque: | No.   No visible swelling or hematoma. |
| Defendant: | Continue. |
| Aminaque: | Then stand.   When he stand I told him to move forward and he do it slowly and then I check the abdomen. |
| Defendant: | And what did you find? |
| Alminaque: | I find that the patient have chronic back pain due to the history of car accident in 2002, but just to be sure that something is okay I just check deeply doing an x-ray. |
| Defendant: | You've asked for x-rays to be conducted on him? |
| Alminaque: | Yes. |
| Defendant: | Is it fair to say, when you say the only evidence that you were able to discern, to find during your examination, was that which came out of his mouth? |
| | .   .   .   . |
| Alminaque: | Correct. |
| Defendant: | Because you didn't see any objective evidence.   There was no bruising or swelling; correct? |
| Alminaque: | Exactly.   I want to make sure that there are no recent injuries in his back. |
| Defendant: | And the handcuffs he complained about, you would expect if they were a problem you would find evidence of an injury on his writs; is that correct? |
| | .   .   .   . |
| Defendant: | You would have expected to find injury on his wrist. |
| Alminaque: | Yes. |
| Defendant: | Did you find or note any— |
| Alminaque: | No, both wrists were checked.   No visible injury, which means nothing on the—no visible injury. |

Because Dr. Moya's Expert Report is based upon insufficient information about the case, it is unreliable.[17]   Even if he had identified and relied upon proper methodology, Dr. Moya has failed to connect it with the facts in this case.

As noted above, in his Report and deposition, Dr. Moya made no attempt to consider and rule out other possible causes for Plaintiff's medical condition.

> Certainly, scientists may form an initial tentative hypotheses.   However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.."   *Claar v. Burlington N.R.R. Litigation*, 35 F.3d 717 (3rd Cir. 1994).

*Best*, supra, at 7.

As detailed above, Dr Moya's Expert Report 1) is not supported by scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue; 2) is not supported by sufficient facts or data; 3) is not the product of any identified reliable principles and methods; and 4) is not the product of the application of any such reliable principles and methods to the facts of the case.   Rule 702, F.R.Ev.   In addition, Dr.

---

[17]In *Best v. Lowe's Home Centers, Inc.*, 2008 WL 2359986 (E.D. Tenn.), the court considered the defendant's motion to exclude the testimony of the plaintiff's medical expert under Rule 702, Federal Rules of Civil Procedure, and *Daubert*.   In doing so, the court noted a recent treatise commenting upon the admission of expert testimony following the Supreme Court's decision in *Daubert* which indicates that there are seven"red flags" which should cause concern for the trial court, as gatekeeper, in admitting expert scientific (and now technical) testimony.   One red flag is having insufficient information about the case.

> That is, relying upon proper methodology but failing to connect it with the facts of the case. This is similar to the "fit" requirement of *Daubert*, wherein the Supreme Court stated that a scientific principle may be valid for one purpose but not for another.   The principle, though valid, might not "fit" the facts of the case at bar.   For example, in *Chikovsky v. Ortho Pharmaceudical Corp.*, 832 F.Supp. 341 (S.D. Fla. 1993), the court granted summary judgment after holding inadmissible plaintiff's expert testimony that Retin-A caused the plaintiff's birth defects.   Plaintiff's mother had used Retin-A topically for skin blemishes during her pregnancy.   Some studies tended to show a connection between a product similar to Retin-A and birth defects, but only when the product was taken orally and in large doses.   Plaintiff's expert did not know how much Retin-A plaintiff had applied to her skin during pregnancy, however, and it was clear that the amount could not have approached the dosages in the studies relied upon by the expert.   *See also, Bogosian v. Mercedes-Benz of North America, Inc.*, 104 F.3d 472 (1st Cir. 1997); *Sorensen v. Shaklee Corp.*, 31 F.3d 638 (th Cir. 1994).

*Best*, supra, at 6.

Moya's Expert Report 1) is not based upon methodology that can and has been tested; 2) is not based upon methodology that has been subjected to peer review and publication; 3) is not based upon any known or potential rate of error and any existing and maintained standards controlling the operation of such methodology; 4) and is not based upon any methodology that has gained general acceptance in the scientific community. *Daubert*.   For the reasons discussed above, Dr. Moya's Expert Report is unreliable and it, along with his testimony based thereon should be excluded pursuant to Rule 104, and Rule 702, Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and all other applicable law.

                             Respectfully submitted,

                             WIFREDO A. FERRER
                             UNITED STATES ATTORNEY

By        s/ Charles S. White
                             CHARLES S. WHITE
                             Fla. Bar No. 394981
                             Assistant United States Attorney
                             99 N.E. 4th Street, Suite 300
                             Miami, Florida   33132
                             Tel. (305) 961-9286
                             Fax. (305) 530-7139
                             E-mail: charles.white@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 10-24338-CIV-COOKE/Torres**

**ANDREW D. MARSHALL,**

       **Plaintiff,**

  **vs.**

**UNITED STATES OF AMERICA,**

       **Defendant.**

_____/

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on May 28, 2015 I electronically filed the forgoing document with the Clerk of the Court using CM/ECF.  I also certify that the forgoing document is being served this day on all counsel of record or pro se parties identified on the attached service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                   Respectfully submitted,

                   WIFREDO A. FERRER
                   UNITED STATES ATTORNEY

          By      s/ Charles S. White
                   CHARLES S. WHITE
                   Fla. Bar No. 394981
                   Assistant United States Attorney
                   99 N.E. 4th Street, Suite 300
                   Miami, Florida  33132
                   Tel. (305) 961-9286
                   Fax. (305) 530-7139
                   E-mail: charles.white@usdoj.gov

**SERVICE LIST**
**MARSHALL v. UNITED STATES OF AMERICA,**
**Case No. 10-24338-CIV-COOKE/Turnoff**
**UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA**

Markenzy Lapointe, E*sq.*
Florida Bar No. 172601
email: mlapointe@bsfllp.com
100 S.E. 2nd Street, Suite 2800
Miami, FL 33101
Counsel for Plaintiff
(305) 539-8400 *(Tel.)*
(305) 539-1307 (Fax)

Charles S. White
Assistant United States Attorney
99 N.E. 4th Street, Suite 300
Miami, Florida   33132
Tel. (305) 961-9286
Fax. (305) 530-7139
charles.white@usdoj.gov
Attorney for Defendant